UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

MICHAEL BOYD,

                    Plaintiff,

        v.

RIGGS DISTLER & COMPANY, INC.,

                    Defendant.

Civil Action

No. 1:20-CV-14008-KMW-EAP

**OPINION**

Andrew S. Abramson, Esquire
Abramson Employment Law, LLC
790 Penllyn Pike, Suite 205
Blue Bell, PA 19422

           *Counsel for Plaintiff Michael Boyd*

Douglas Diaz, Esquire
Archer & Greiner, PC
One Centennial Square
Haddonfield, NJ 08033

           *Counsel for Defendant Riggs Distler and Company, Inc.*

**WILLIAMS, District Judge:**

I.     **INTRODUCTION**

       This matter comes before this Court pursuant to the Motion for Summary Judgment filed

by Defendant Riggs Distler & Company, Inc. ("RDC" or "Defendant"). Plaintiff Michael Boyd

("Plaintiff") opposed this Motion. Plaintiff initiated the underlying action against RDC, his former

employer, alleging violations of the Family and Medical Leave Act (the "FMLA"), 29 U. S. C. §§

2601, *et seq.*, and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. §§ 10:5-

1, *et seq.* RDC seeks summary judgment on these claims. For the reasons set forth more fully below, RDC's Motion is denied.

## II.   BACKGROUND

Plaintiff initiated the underlying action against RDC, his former employer, alleging violations of the Family and Medical Leave Act (the "FMLA"), 29 U. S. C. §§ 2601, *et seq.*, and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. §§ 10:5-1, *et seq.* More specifically, Plaintiff claims that RDC unlawfully interfered with and retaliated against his rights under the FMLA, and that he was discriminatorily discharged for his age and perceived disability under the NJLAD.

RDC is an electrical, mechanical, and utility construction company. *See* Pl.'s Counterstatement of Material Facts ("Pl.'s CSMF") ¶ 2. RDC hired Plaintiff for a warehouse position in 2005, and subsequently promoted him to the position of tool room manager. *See id.* ¶¶ 7–8. Plaintiff is sixty-four years old and was employed with RDC for approximately fifteen years prior to his termination in 2020.[1] *See id.* ¶ 1.

During the relevant time period, Plaintiff was the direct supervisor of at least four RDC employees. *See id.* ¶ 12. Plaintiff reported directly to Joe Mason ("Mason"), who in turn reported to the president and CEO of RDC, Steve Zemaitatis ("Zemaitatis"). *See id.* ¶¶ 10–11. During his fifteen years of employment with RDC, Plaintiff was never issued any written warnings or discipline. *See id.* ¶ 75. In each of the three years preceding Plaintiff's termination in August 2020,

---

[1] Plaintiff properly submitted with his Opposition a counterstatement of disputed material facts. (ECF No. 25-1). RDC failed to file a responsive statement of material facts in its Reply, despite the clear directive of this Court's Local Rules. *See* L. Civ. R. 56(a)(1) ("In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. The movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers."). Notwithstanding RDC's failure to respond to Plaintiff's counterstatement, the record is replete with factual disputes precluding summary judgment.

Plaintiff received positive performance reviews, which led RDC to raise Plaintiff's salary each year. *See id.* ¶¶ 13–22.

### A.  **Plaintiff's FMLA Leave**

Plaintiff has a long history of back problems. *See id.* ¶ 23. In January 2020, Plaintiff, began experiencing extreme back pain, which required him to undergo surgery for a spinal fusion. *See id.* Consequently, Plaintiff requested and was granted FMLA leave for a twelve-week period beginning January 6, 2020, through April 6, 2020. *See id.* ¶ 24.

While Plaintiff was on FMLA leave, his subordinate, John Hendrickson ("Hendrickson"), assumed Plaintiff's duties at RSD. *See id.* ¶ 25. On March 30,2020, as Plaintiff's leave was about to end, Plaintiff sent an email to Mason informing him that his physician had cleared him to return to work without restrictions, and that he was prepared to return to work as planned. *See id.* ¶ 30. However, Mason, responded to Plaintiff's email, stating "I spoke with [Zemataitis], and until COVID-19 restrictions are lifted, we ask that you stay home. Let's shoot for May 1, 2020." *Id.* ¶ 31. Zemataitis separately informed Plaintiff that he could not return to work for another four weeks, and suggested that he instead seek disability or unemployment benefits. *See id.* ¶ 32. Because Plaintiff had already been cleared to return to work, he was forced to rely on and collect unemployment benefits for the four weeks that he was not permitted to return to work. *See id.* ¶ 33. Crucially, RDC permitted at least four other employees—all of whom had worked under Plaintiff—to continue working on-site, and without interruption or layoff during this same time frame. *See id.* ¶ 34.

### B.  **Plaintiff's Return to Work and Subsequent Termination**

On May 6, 2020, Plaintiff returned to work at RDC. *See id.* ¶ 38. However, prior to Plaintiff's FMLA leave, Plaintiff requested and was granted a week of previously scheduled

vacation time in August 2020. *See id.* ¶ 40. According to Plaintiff, when discussing his upcoming vacation with Mason, Mason stated, "You have been on vacation for four months." *Id.* Plaintiff points to this comment as evidence of Mason's resentment towards Plaintiff for having utilized his FMLA leave. *See id.* ¶ 41.

On August 13, 2020, Hendrickson asked Plaintiff to come to the warehouse to show him that someone had placed furniture in the aisles, which was blocking access to their tools. *See id.* ¶ 45. As Plaintiff was responsible for the warehouse, he called Mason to inform him of the problem. *See id.* ¶¶ 45–46. Upon arriving, Mason asked what the problem was, to which Plaintiff replied, "It is ridiculous. We cannot even get our tools down to fulfill jobs," and that there were "safety issues all over the place." *See id.* ¶ 48. In response, Mason stated, "Why are the four of you over here? No wonder nothing gets done around here." *See id.* ¶ 48. Hendrickson, who was also present, also expressed that it was impossible to work under these conditions. *See id.* ¶ 49. Plaintiff made the comment, "This is f-ing ridiculous." *Id.* ¶ 50. Apparently, based on this discourse, Mason sent Plaintiff home, stating that he could return to work "[w]hen [his] attitude changes." *Id.* ¶ 53. Plaintiff maintains that he did not direct this comment toward Mason, and that it was said in frustration regarding the situation. *See id.* ¶ 51. Plaintiff also states that he never yelled, and did not say any other profanities beyond this. *See id.* ¶¶ 50, 52. Moreover, Plaintiff contends that other employees were never disciplined when they cursed or used "shop talk." *Id.* ¶ 58. Further, Plaintiff has heard Mason and Zemaititis use profanity when speaking to employees and in their conversations at work. *See id.*

Later that same day, Mason and Zemaitatis made the decision to terminate Plaintiff. *See id.* ¶ 77. Zemaitatis testified that, upon Mason informing him that he wanted to terminate Plaintiff, Zemaitatis said to Mason, "You know what the process is, make sure you do it properly." *Id.* ¶ 78.

Thereafter, Mason informed RDC's senior director of human resources, Suanymira Tasci ("Tasci"), of the decision to terminate Plaintiff. *See id.* ¶ 79–80. Mason advised Tasci that Plaintiff had a poor attitude, that Plaintiff had refused to follow his instructions, and that Plaintiff was belligerent to coworkers. *See id.* ¶ 80. Tasci testified that no one at RDC had informed her that there were ever any issues with Plaintiff prior to this day. *See id.* ¶ 81.

The following day, in anticipation of firing Plaintiff, Mason drafted a "Progressive Discipline Memorandum" (the "Discipline Memo"), dated August 13, 2020. *See id.* ¶ 86. In it, Mason cites to insubordination and absenteeism as the bases for Plaintiff's termination. *See* Pl.'s Ex. T at 2. Concerning Plaintiff's purported insubordination, Mason detailed past instances of poor attitude, including the incident in the warehouse that occurred earlier in the day. *See id.* at 1. Mason did not, however, mention these issues to Plaintiff. *See id.* ¶ 87. Plaintiff, also points to a variety of what he maintains are falsities and inconsistencies in Mason's Discipline Memo. For example, concerning the warehouse incident, Mason states that Plaintiff "came into [his] office demanding an answer as to what to do with the furniture sitting in the aisle," and that Plaintiff had also told him to "get out of [his] chair and do some work." Pl.'s Ex. T at 1. Plaintiff maintains that he never made these statements. *See* Pl.'s CSMF ¶¶ 88, 94. The Discipline Memo also details certain statements that Mason made to Plaintiff, which Plaintiff insists are either inaccurate or completely false. *See id.* ¶¶ 88, 90–91, 97.

Concerning Plaintiff's purported absenteeism, Mason notes that, since Plaintiff had returned from his FMLA leave, he called off of work on three occasions between June and July of 2020. *See* Pl.'s Ex T at 2. Mason also cites to Plaintiff's approaching vacation scheduled the following week—the same time off that prompted Mason to characterize Plaintiff's FMLA leave as a four-month vacation. *See id.* Plaintiff concedes that in the weeks following his return to work,

there were occasions when he used his allotted paid-time-off ("PTO") because he was ill or needed to see a doctor. *See* Pl.'s CSMF ¶ 113. For example, on July 6, 2020, Plaintiff woke up with significant pain in his abdomen, and as a result called out of work prior to the start of his shift. *See id.* ¶ 118. This same day, Plaintiff's physician informed him that he had an umbilical hernia, which would eventually need to be surgically corrected. *See id.* ¶ 119. When Plaintiff returned to work the following day, he advised Mason about the diagnosis and provided him with a note from his physician. *See id.* Nevertheless, Mason concludes in the Discipline Memorandum that RDC is "very busy," and that it needs "reliable consistent help." Pl.'s Ex. T at 2.

To the extent RDC takes issue with the manner in which Plaintiff provided proper, advance notice of his PTO, Plaintiff maintains that his notices to Mason were consistent with the practices that Mason and RDC had always found acceptable over the fifteen years of his employment. *See* Pl.'s CSMF ¶¶ 114–15. Specifically, Plaintiff details RDC's practice of merely requiring employees, like Plaintiff, to send an email or call in prior to the beginning of the workday. *See id.* ¶ 114. RDC never required employees to cite to any specific reason when using PTO, and likewise did not demand prior approval. *See id.* Though, Plaintiff would advise RDC of the reason for his absence upon his return. *See id.* ¶ 115. Plaintiff contends that Mason's reliance on his use of PTO is evidence that Mason and RDC were holding Plaintiff's FMLA leave against him. *See id.* ¶ 133. Plaintiff also contends that RDC viewed him as old and/or disabled, and thought him to be a risk of injury, or that he otherwise could not do his job. *See id.*

## III.   LEGAL STANDARD

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.

1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV.    DISCUSSION

### A.  <u>Claims Under the Family Medical Leave Act ("FMLA")</u>

The purposes of the FMLA are to "balance the demands of the workplace with the needs of families and to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)–(2); *see also Petras v. IAP Worldwide Servs.*, Inc., No. 07-170, 2008 WL 5395750, at *11 (D.N.J. Dec. 23, 2008). To this end, the FMLA was enacted to provide up to twelve weeks of leave for workers whose personal or medical circumstances necessitate that they take time off from work in excess of what their employers are willing or able to provide. *See* 29 U.S.C. § 2612(a)(1)(D); *see also Victorelli v. Shadyside Hops.*, 128 F.3d 184, 186 (3d Cir. 1997). To protect an employee's rights under the FMLA, employers are prohibited from engaging in certain actions. First, the FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" (*i.e.*, an "interference" claim). 29 U.S.C. § 2615(a)(1). It likewise makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" (*i.e.*, a "retaliation" claim). *Id.* § 2615(a)(2).

Here, Plaintiff asserts claims against RDC for both interference and retaliation under the FMLA. The Court addresses each in turn.

### 1.  *FMLA Interference*

"Interference claims are based on the prescriptive sections of the FMLA which create substantive rights for eligible employees." *Foster v. Kennedy Univ. Hosp., Inc.*, No. 20-4415, 2022 WL 2981156, at *4 (D.N.J. July 28, 2022) (internal quotation marks omitted). One of the substantive rights vested in FMLA-protected employees is of reinstatement to his former position, or an equivalent one, following a qualified leave of absence. *See* 29 U.S.C. § 2614(a)(1). That

right—as well as an employer's corresponding duty to reinstate the employee—is triggered when the employee submits a statement from a healthcare provider certifying that the employee may return to work. *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 255 n.4 (3d Cir. 2014). In the absence of any qualified exception, an employer's failure to restore an employee following a qualified leave constitutes an interference with the employee's right to reinstatement under the FMLA. *See id.* at 253.

To prevail on an interference claim, an employee need only prove (1) that he was entitled to be reinstated under the FMLA, and (2) that his employer failed to reinstate him. *See id.* at 252; *see also Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). A plaintiff is not required to show that his employer harbored discriminatory or retaliatory animus in connection with its alleged interference. *See Callison*, 430 F.3d at 120. This is because "[a]n interference claim is not about discrimination and therefore, a burden-shifting analysis, such as that which courts employ under *McDonnell Douglas* and its progeny, is not required." *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 525–26 (D.N.J. 2008) (internal quotation marks omitted).

Here, Plaintiff claims that RDC unlawfully interfered with his right to be reinstated under the FMLA when it refused to restore his employment following his qualified leave. The undisputed record evidence demonstrates that on March 30, 2020, Plaintiff emailed Mason, providing notice of his intent to return to work, as well as a note from his physician certifying that Plaintiff was cleared to work without restrictions beginning April 6, 2020. Thus, Plaintiff preserved his right to be reinstated upon the completion of his FMLA leave. *See Budhun*, 765 F.3d at 255 n.4. However, RDC did not reinstate Plaintiff on April 6, 2020, citing the COVID-19 pandemic. RDC indicated that it would consider letting Plaintiff return a month later on May 1, 2020. Separately, Zemaitatis also recommended that Plaintiff rely on disability or unemployment benefits during that time.

Plaintiff did not resume working at RDC until May 6, 2020. Because RDC prohibited Plaintiff from returning to work at the conclusion of his qualifying medical leave, Plaintiff claims that RDC interfered with his right to be reinstated under the FMLA.

RDC does not dispute that Plaintiff was entitled to reinstatement. Rather, it seeks summary judgment on the basis that Plaintiff cannot demonstrate that it interfered with his right to be reinstated because it ultimately allowed Plaintiff to return to work. *See* Def.'s Br. at 3. This argument, however, overlooks the one-month period during which RDC failed to allow Plaintiff to return to work. In other words, it ignores the very alleged interference that could reasonably lead a jury to question whether Plaintiff was "reinstated" at all—a finding ostensibly made more likely by RDC's concession that Plaintiff was forced to obtain and rely on unemployment benefits during that time. Regardless, RDC fails to cite to any authority, and the Court is aware of none, suggesting that this one-month intervening period cannot, as a matter of law, constitute interference with Plaintiff's right to reinstatement.

Separately, RDC also asserts, albeit in a conclusory fashion, that "there should be no FMLA interference claim" because it only asked Plaintiff to stay home for another four weeks due to the COVID-19 pandemic. *See* Def.'s Reply at 1. However, an employer cannot justify its actions and demonstrate compliance with the FMLA simply by "establishing a legitimate business purpose" for failing to reinstate an employee as required. *Callison*, 430 F.3d at 120. Although, the right to reinstatement is qualified to some degree by a statutory directive that the FMLA does not entitle an employee to restoration if an employer is "able to show that [he] would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment." 29 C.F.R. § 825.216(a)(1); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004). In this case, RDC does not make the requisite showing.

It may indeed be the case that the COVID-19 pandemic precluded Plaintiff from returning to work on April 6, 2020. But that defense seems to be directly undermined by the undisputed fact that RDC simultaneously permitted Plaintiff's subordinates to continue working on-site, in Plaintiff's absence, and without interruption. *See* Pl.'s SMF at ¶ 33.[2] This is a matter that clearly should be presented to a jury—not to a court on a motion for summary judgment. *Cf. Donnelly v. Cap. Vision Servs., LLC*, No. 20-4189, 2022 WL 17486361, at *8 (E.D. Pa. Dec. 6, 2022) (granting summary judgment as to FMLA interference claim for failure to reinstate where "*all employees* of the company were on furlough at the time due to the Covid-19 pandemic" (emphasis added)). For this reason, as well as for those previously mentioned, summary judgment as to Plaintiff's FMLA interference claim is denied.

### 2. *FMLA Retaliation*

As set forth above, the FMLA's retaliation provision prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful." 29 U.S.C. § 2615(a)(2); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012). Unlike claims for interference, retaliation claims under the FMLA require a showing of the employer's discriminatory or retaliatory intent. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009). Where, like here, a plaintiff relies on circumstantial evidence to prove such intent, it is appropriate for a court to rely on the three-step, burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, Plaintiff has the initial burden of establishing a *prima*

---

[2] RDC also submits that Plaintiff cannot prove that it interfered with Plaintiff's rights under the FMLA because "Plaintiff received his 12 workweeks of FMLA leave and admits as much." Def.'s Br. at 3. This argument is baseless because it purports to challenge a claim that Plaintiff has never asserted. *Compare* 29 U.S.C. § 2612(a)(1)(C) (entitling eligible employees to "a total of 12 workweeks of leave during any 12–month period") *with id.* § 2614(a)(1) (guaranteeing employee's right to be restored to the same or equivalent position upon the completion of FMLA-protected leave); *see also* Compl. ¶ 51.

*facie* case. *See Lichtenstein*, 691 F.3d at 302. If Plaintiff succeeds, the burden then shifts to RDC to "articulate some legitimate, nondiscriminatory reason" for its decision. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). If RDC meets this burden, the burden shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [RDC's] articulated legitimate reasons" for termination. *Id.*

Concerning RDC's Motion for Summary Judgment, Plaintiff concedes that, given the historically low burden required of employers at the second stage of the analysis, it is likely that RDC can easily overcome its burden to establish at least one legitimate, nonretaliatory reason for his termination; the Court agrees. Therefore, the Court only addresses whether Plaintiff can (1) establish a *prima facie* claim for retaliation under the FMLA; and (2) point to sufficient evidence discrediting RDC's asserted reasons as pretext for a retaliatory motive. The Court addresses each in turn.

a) <u>*Prima Facie* Case</u>

To make out a *prima facie* claim for retaliation under the FMLA, Plaintiff must show that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights. *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).

Here, RDC challenges only the third prong of Plaintiff's *prima facie* burden, and argues that it is entitled to summary judgment because Plaintiff cannot establish any causal link between his FMLA leave and his termination. Generally speaking, a plaintiff may demonstrate causation in two ways. First, a plaintiff may show "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). When the temporal proximity between the protected activity and

adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Second, "a plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Id.*

Whether a causal link exists "must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000). Here, the Court considers whether "the proffered evidence, looked at as a whole, may suffice to raise [an] inference" of causation. *Lichtenstein*, 691 F.3d at 307. The record shows that, while Plaintiff was still on FMLA leave, RDC rejected Plaintiff's request to return to work. On one hand, it represented to Plaintiff that it was unable to restore him to employment because of the COVID-19 pandemic. On the other hand, it simultaneously permitted all of Plaintiff's subordinates to continue working on-site and without interruption. Plaintiff has also testified that, after returning to RDC in May 2020, Mason took issue with Plaintiff's forthcoming vacation because Plaintiff had already "been on vacation for four months." Pl.'s CSMF ¶ 41.

Lastly, Mason's August 2020 Discipline Memo cites, not only to this future vacation, but also to at least three other instances in which Plaintiff needed to utilize his PTO. Importantly, Mason expressly states that his tallying departed from the time Plaintiff first returned from FMLA leave. *See* Pl.'s Ex. T at 2 ("Since your return on 5-1-20 you called out 3 times[.]"). All of this does not even take into account the evidence Plaintiff presents that RDC has applied its attendance policy against him in a way that is not consistent with its prior practices in the fifteen years he worked for RDC. For all of these reasons, the Court finds that Plaintiff has presented sufficient evidence to present to a jury as to the question of pretext.

RDC also argues that Plaintiff cannot prove that his termination was connected to his FMLA leave because it had actually "provided Plaintiff with *more* leave when it gave him an additional month of leave beyond the FMLA time." Def.'s Br. at 5 (emphasis in original). This argument is unconvincing for the obvious reason that involuntary unemployment is not "leave" at all, much less "*additional* leave" under the FMLA. Def.'s Reply at 3 (emphasis in original). To be sure, unemployment funds, like those in New Jersey, are reserved for workers who, as a result of legitimate unemployment, face "economic insecurity" that "so often falls with crushing force upon the unemployed worker and his family." N.J. Stat. Ann. § 43:21-2. Unemployment benefits are not, as RDC appears to suggest, rainy-day funds that employers may graciously divvy out at their discretion. *See, e.g.*, N.J. Stat. Ann. § 43:21-6 (charging the New Jersey Division of Unemployment Insurance with determining worker eligibility for unemployment benefits). Thus, the notion that failing to timely reinstate an employee from FMLA leave and forcing the employee to apply for unemployment benefits can extinguish any inference of antagonism is as much puzzling as it is wrong.

The Court concludes that there is sufficient evidence in the record from which a jury could conclude that there is a causal connection between Plaintiff's FMLA leave and his termination. Summary judgment on this basis is therefore denied.

b) *Pretext*

To demonstrate that an employer's proffered reasons for termination were pretextual, a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious retaliatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Fuentes*, 32 F.3d at 764.

Here, RDC argues that Plaintiff's retaliation claim fails at the pretext stage because he cannot overcome the "multitude and growing list of infractions he committed commencing in June 2020." The problem for RDC, however, is that Plaintiff is not required at this stage to conclusively rebut each articulated reason. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 732 (3d Cir. 1995). Indeed, to survive summary judgment, Plaintiff "need not also come forward with additional evidence of discrimination beyond his . . . prima facie case" if he can point to sufficient evidence "to discredit the [RDC's] proffered reasons." *Fuentes*, 32 F.3d at 764. Rather, he is only expected to point to "weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them unworthy of credence," and therefore infer that the proffered nonretaliatory reasons "did not actually motivate" the employer's action. *Id.* at 764–65 (internal quotation marks omitted). Where, like here, an employer "proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Id.* at 764.

As it relates to Plaintiff's FMLA retaliation claim, the Court finds that Plaintiff has successfully done just that. Specifically, Plaintiff has pointed to evidence of, among other things: (1) incoherencies in RDC's proffered reasons for not permitting Plaintiff to return to work; (2) inconsistent application of RDC's policies and practices concerning absenteeism; (3) uneven application of its disciplinary policy; (4) comments from his superiors suggesting intolerance of Plaintiff's FMLA leave; and (5) contradictions and falsities in Mason's Discipline Memo.

Though RDC's reasons for termination may be legion, there is enough evidence that could lead a reasonable jury to disbelieve RDC or to question its motives for terminating Plaintiff. *See*

*Fuentes*, 32 F.3d at 764. Insofar as RDC disputes the weight of Plaintiff's evidence, it only confirms that its Motion for Summary Judgment is inappropriate.

For all of the reasons set forth above, summary judgment as to Plaintiff's claims for interference and retaliation under the FMLA are denied.

### B.  Claims Under the New Jersey Law Against Discrimination ("NJLAD")

"The NJLAD was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination, where the NJLAD declares that the opportunity to gain employment without fear of discrimination is a civil right." *Thurston*, 941 F. Supp. 2d at 534 (citing *Viscik v. Fowler Equip. Co., Inc.*, 800 A.2d 826 (N.J. 2002)). When examining claims brought under the NJLAD, courts will often look to federal law dealing with civil rights and employment discrimination. *See Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) (explaining that the analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims); *see also Mancini v. Township of Teaneck*, 794 A.2d 185 (N.J. Super. Ct. App. Div. 2002) (observing that trial court "properly looked to federal law dealing with Title VII and Civil Rights legislation to determine what constituted an adverse employment action in the context of a LAD retaliation claim"). Moreover, in analyzing claims under the NJLAD, the New Jersey Supreme Court has adopted the analysis outlined by the U.S. Supreme Court in *McDonnell Douglas*, as discussed above. *See Andersen v. Exxon Co., U.S.A.*, 446 A.2d 486 (N.J. 1982); *see also Thurston*, 941 F. Supp. 2d at 535. This Court will thus use that process in analyzing Plaintiff's NJLAD claims.

Here, Plaintiff asserts two separate claims for discriminatory discharge on the basis of age and perceived disability. The Court addresses each below.

1. *Age Discrimination*

The NJLAD prohibits employers from, among other things, discharging an individual from employment because of the individual's age. N.J.S.A. § 10:5–12(a). To prevail on a claim under the NJLAD for age discrimination, a plaintiff must show that a prohibited consideration of age "played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Harth v. Daler-Rowney USA Ltd.*, No. 09-5332, 2012 WL 893095, at *2 (D.N.J. Mar. 15, 2012) (citing *Bergen Commercial Bank v. Sisler*, 723 A.2d 944 (N.J. 1999)) (internal quotation marks omitted).

Concerning the burden-shifting analysis, RDC does not challenge Plaintiff's ability to make out a *prima facie* case for age discrimination. Nor does Plaintiff dispute RDC's ability to articulate a legitimate, nondiscriminatory reason for his termination. Thus, the only question before the Court is whether Plaintiff can demonstrate that RDC's proffered reasons for his termination were pretextual. *See Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 634 (D.N.J. 2012).

The Court declines to devote any further analysis to Plaintiff's ability to prove pretext because its discussion would be duplicative of that concerning Plaintiff's FMLA retaliation claim. The same analysis and framework apply here, and the Court finds no reason to find a different result. *See* Part IV(A)(2)(b), *infra*.

However, to be sure, the Court notes that Plaintiff has proffered additional evidence that is particularly relevant to his age discrimination claim. The record reflects that Plaintiff is sixty-four years old. Hendrickson, Plaintiff's younger subordinate, assumed all of Plaintiff's responsibilities while Plaintiff was on FMLA leave. When RDC declined Plaintiff's request to return to work due to the pandemic, Hendricks continued to work on-site in Plaintiff's role. When terminating Plaintiff, Mason indicated in his Discipline Memo that he was firing Plaintiff because he caught

both him and Hendrickson smoking on the job. Plaintiff insists that this is not true, and that only Hendrickson was smoking. Regardless, it does not appear from the record that Hendrickson was terminated for smoking, much less disciplined. Instead, RDC promoted Hendrickson to Plaintiff's position after it terminated Plaintiff.

For these additional reasons, summary judgment as to Plaintiff's age discrimination claim under the NJLAD is denied.

### 2. *Disability Discrimination*

The NJLAD recognizes a disability discrimination claim, not only for employees who have had a disability at any time, but also for those who are "perceived as or believed to be a person with a disability, whether or not that individual is actually a person with a disability." N.J.A.C. 13:13-1.3. To sustain a *prima facie* case of disability discrimination under the NJLAD, Plaintiff must show that (1) he qualified as an individual with a disability, or is perceived as having a disability; (2) he is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation; (3) he experienced an adverse employment action; and (4) the employer sought another to perform the same work after he was removed from the position. *See Lopez v. Lopez*, 997 F. Supp. 2d 256, 272 (D.N.J. 2014).

Here, RDC argues that Plaintiff fails to point to sufficient evidence demonstrating that he was ever disabled. Plaintiff, however, concedes that he did not have any actual disability, but rather that RDC discriminated against him because it perceived him to be disabled. Thus, the success of RDC's Motion pivots on the first prong of Plaintiff's *prima facie* burden—whether he can adequately demonstrate that RDC "perceived" him as having a disability.

"Under the NJLAD, the 'perceived disability' doctrine applies when an employer believes the employee has a physical or mental condition that would qualify the person as disabled under

the NJLAD if the condition actually existed." *Est. of Fajge v. Dick Greenfield Dodge, Inc*., No. 11-CV-04527, 2012 WL 2339723, at *12 (D.N.J. June 18, 2012) (internal quotation marks omitted). The statutory definition of "disability" under the NJLAD is exceptionally broad in scope, and includes any "physical disability [or] infirmity . . . which is caused by bodily injury . . . or illness." N.J.S.A. 10:5–5(q); *see also Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 236 (D.N.J. 2015); *Viscik v. Fowler Equip. Co.*, 800 A.2d 826 (N.J. 2002). However, "[u]nlike the definition of disability under the 'actually disabled' prong of the ADA definition of disability, [the] NJLAD does not require that a disability restrict any major life activities to any degree." *Weber v. Don Longo, Inc.*, No. 15-2406, 2018 WL 1135333, at *14 (D.N.J. Mar. 2, 2018); *see also Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016) ("The NJLAD defines disability in a broader sense than does federal law.").

Here, the Court finds that Plaintiff has offered enough evidence to reasonably suggest that RDC had knowledge of Plaintiff's various medical conditions, and that Plaintiff's termination might have been motivated, at least in part, by a perceived disability. For example, it is undisputed that RDC knew that Plaintiff had a history of back problems; after all, Plaintiff had quite recently recovered from a spinal fusion during a twelve-week medical absence that RDC approved. *Simonetti v. Broadridge Fin. Sols., Inc.*, No. 10-3903, 2012 WL 32931, at *10 (D.N.J. Jan. 5, 2012) ("[C]ourts have expressly recognized back injury as falling within the statute's purview."). In addition, on July 7, 2020, Mason learned that Plaintiff was treated for significant abdominal pain due to a newly diagnosed umbilical hernia. *See Rodriguez v. Guest Packaging, LLC*, No. A-4434-09T4, 2011 WL 2731888, at *4 (N.J. Super. Ct. App. Div. July 15, 2011) (recognizing an umbilical hernia as a "physical disability" under the NJLAD because it prevents the "normal exercise of a bodily function" and requires "treatment for [its] resolution"). Mason also knew that this condition

was the reason why Plaintiff called out of work sick on July 6, 2020, and that Plaintiff would be required to undergo another surgery at some point in the future. Further, Mason's Discipline Memo also cites to this absence as one of the reasons why Plaintiff was terminated.

Based on the foregoing, the Court is satisfied that a reasonable jury could find, "particularly in light of New Jersey's broad interpretation of the NJLAD," that Plaintiff's medical conditions qualify as disabilities under the NJLAD, and that RDC knew of these disabilities. *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 237 (D.N.J. 2015) (denying summary judgment as to discrimination claim for perceived disability where there was evidence establishing a recognized disability under the NJLAD and the employer's knowledge of the same); *see also Stowell v. Black Horse Pike Reg'l Sch. Dist.*, No. 17-06633, 2019 WL 6044937, at *7 (D.N.J. Nov. 15, 2019) (finding *prima facie* burden met where plaintiff school teacher had a recognized disability under the NJLAD; (2) the teacher had spoken to the principal about the disability at the beginning of the school year; (3) the school district knew plaintiff was to have surgery during the school year).[3] The Court therefore finds that Plaintiff can successfully make out a *prima facie* case for disability discrimination under the NJLAD. Summary judgment is accordingly denied.[4]

## V.   CONCLUSION

For all of the reasons set forth above, RDC's Motion for Summary Judgement is denied.

---

[3] To be clear, Plaintiff does not argue—and nor does the Court hold—that he was actually disabled under the NJLAD. Insofar as the Court finds that Plaintiff's underlying conditions might statutorily qualify as disabilities, it does so only for the limited purpose of assessing whether Plaintiff could have been "perceived" as disabled under the NJLAD. *See Est. of Fajge*, 2012 WL 2339723, at *12.

[4] Here too, the Court finds that RDC can articulate a legitimate, nondiscriminatory reason for Plaintiff's termination, and that Plaintiff can potentially rebut those reasons as pretextual. *See* Parts IV(A)(2)(b), (B)(1), *infra*.

Dated: December 29, 2022

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
United States District Judge